IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

THOMAS BILLUPS                                                                    PLAINTIFF

v.                                                           CIVIL ACTION NO. 1:24-CV-74-SA-RP

LOUISVILLE MUNICIPAL SCHOOL DISTRICT                              DEFENDANT

SANCTIONS ORDER

This matter comes before the Court on its own initiative. On September 11, 2025, the Court entered an Order to Show Cause [69] directing Thomas Billups' counsel, Jane Watson, Louis Watson, and Nick Norris, to show cause as to why the Court should not impose sanctions against them pursuant to Rule 11 of the Federal Rules of Civil Procedure and/or the Court's inherent authority. A hearing on this matter was held on October 24, 2025. At the hearing, counsel admitted to submitting a memorandum that contained fabricated case citations and misrepresentations of case holdings—all resulting from unverified artificial intelligence ("AI") usage. The Court now turns to the issue of an appropriate sanction.

*Relevant Factual and Procedural Background*

On April 19, 2024, Thomas Billups initiated this lawsuit by filing his Complaint [1] against Louisville Municipal School District ("LMSD"). Billups brings an age discrimination claim and is represented by Watson & Norris, PLLC ("the Firm"). Attorneys Jane Watson ("Ms. Watson"), Louis Watson ("Mr. Watson"), and Nick Norris all entered an appearance in the case on behalf of Billups.[1]

---

[1] Through a supplemental letter submitted to the Court (and copying counsel of record), Norris notified the Court that on October 31, 2025, he provided notice to Louis Watson that he intended to terminate their partnership and begin practicing as a sole practitioner. The Court cursorily notes this development and will address it in more detail hereinafter. Based upon information provided by these attorneys at the hearing, Norris, Ms. Watson, and Mr. Watson were the only attorneys practicing at the Firm when the conduct at issue occurred.

On May 22, 2025, LMSD filed a Motion for Summary Judgment [60] seeking dismissal of Billups' claim. Billups filed a Response in Opposition [64] and supporting Memorandum [65] on June 12, 2025. Ms. Watson and Norris were signatories on the Response Memorandum [65]. On June 26, 2025, LMSD filed a Reply [68].

In reviewing the filings, the Court immediately identified issues with multiple case citations in Billups' Response Memorandum [65]. Upon further review and extensive research, the Court found within the Memorandum [65] one case citation to a nonexistent case and multiple instances where case holdings were misrepresented. In total, there were four problematic citations identified in the Response Memorandum [65]:

1) "*United States v. Dr. Pepper Bottling Co. of Tex.*, 130 F. Supp. 2d 846, 851 (N.D. Tex. 2001)" (nonexistent case);

2) "*Jackson v. Gautreaux*, 3 F. 4th 182, 190 (5th Cir. 2021)" (existing case but misrepresents the holding);

3) "*Jackson v. Cal-W. Packaging Corp.*, 602 F. 3d 374, 380 (5th Cir. 2010)" (existing case but misrepresents the holding); and

4) "*Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F. 3d 473, 476 (5th Cir. 2015)" (existing case but misrepresents the holding).

As noted previously, on September 11, 2025, the Court issued an Order to Show Cause [69] directing Ms. Watson, Mr. Watson, and Norris "to show cause as to why the Court should not impose sanctions pursuant to Federal Rule of Civil Procedure 11 and/or its inherent authority" for "[t]he submission of fictitious legal authorities and making misrepresentations of case law[.]" [69] at p. 1. As a result of these issues, the Court was unable to rule on the underlying Motion [60] and had to cancel the jury trial originally scheduled for October 20, 2025.

Notably, on September 3, 2025, prior to the entry of this Court's Order [69], the District Court for the Southern District of Mississippi issued a similar order identifying discrepancies found in legal authorities cited in a brief signed and submitted by Ms. Watson. *See Lewis v. Entergy*

2

*Mississippi, LLC*, 3:25-CV-323-HTW-ASH, Dkt. [22]. That order directed Ms. Watson to file a written response (supported by a declaration signed under penalty of perjury) explaining how the discrepancies occurred. *See id.* In an affidavit accompanying her response, Ms. Watson admitted to using an AI tool to assist her in drafting the brief at issue in that case. *See* [23], Ex. 1 at p. 1-3. Ms. Watson also admitted that she did not verify the accuracy of the citations generated by the AI tool before submitting the brief to the court. *See id*.

Reverting to this case, on October 13, 2025, Ms. Watson, along with Mr. Watson and Norris, filed a Motion for Leave to File Corrected Memorandum [73]. The Motion [73] stated in part:

> Plaintiff's counsel used AI tools to assist in drafting the memorandum response filed on June 12, 2025. Upon review, counsel identified inaccuracies in certain citations, resulting from unverified AI-generated research.

[73] at p. 1.

That Motion [73] remains pending at this time. On October 24, 2025, the Court held the show cause hearing. From the outset, Ms. Watson admitted to using AI to assist in research and drafting without verifying the output, which resulted in the Memorandum [65] being tainted with misrepresentations of law. The Court presented Ms. Watson with a chart of all the misrepresentations that it had identified in the filed Response Memorandum [65].[2] After being provided an opportunity to review the chart, Ms. Watson agreed with the Court's findings articulated therein.

Following this admission, further explanation from counsel revealed a concerning sequence of events.

---

[2] The chart is attached as an Appendix to this Order.

For context, at all times pertinent to this case, Watson & Norris, PLLC was a plaintiff's firm that specialized in employment law. The Firm consisted of two partners, Mr. Watson and Norris, and one associate, Ms. Watson. Counsel explained at the hearing that Norris acted as lead counsel on all litigation while Mr. Watson handled administrative agency work. Mr. Watson was typically not involved in litigation until trial was imminent. In 2023, Ms. Watson joined the Firm as a legal assistant and then, after being admitted to the Mississippi Bar in 2024, became an associate attorney.

Ms. Watson worked primarily as a brief writer under Norris' supervision. Norris reviewed and made revisions to all of Ms. Watson's drafted documents. At the hearing, Norris explained that a draft would typically go through several iterations before he approved a final version for Ms. Watson to file.

According to counsel, in March of 2025, an opposing attorney in a case unrelated to the case *sub judice* contacted Ms. Watson and informed her that the attorney noticed certain discrepancies in a brief that Watson had filed. This same attorney then called Norris and informed him of the issue and that it appeared to the attorney that Ms. Watson had utilized AI. Norris independently confirmed that Ms. Watson used unverified AI output. Of note, also in March 2025, the Firm's three attorneys attended a continuing legal education ("CLE") course on ethics in utilizing AI.

Following the realization of this incident, Norris and Mr. Watson discussed and instituted an AI usage policy for the Firm. For context, the Firm has used a case management software named Smokeball for several years. Within the last year, Smokeball added a built-in AI tool called "Archie" that, according to Norris, keeps all files internal.[3] "Archie" can assist in discovery

---

[3] Norris explained "Archie" can only be used to search documents already uploaded into the Smokeball software and "it does not go outside." [77] at p. 18.

research, document review, and drafting.[4] Norris explained that the Firm's entire staff was allowed to use "Archie."

The Firm's newly adopted AI policy limited Ms. Watson's AI usage to "Archie" and banned the use of any external AI tool. The Firm explained that Ms. Watson was strongly encouraged to use traditional legal research methods. Ms. Watson apparently told the Firm that she would comply with the policy—a promise she clearly did not keep.

After receiving the two show cause orders within a matter of days, the Firm realized that Ms. Watson had consistently violated the AI policy since its inception. The Firm then began reviewing filings that Ms. Watson had drafted and located ten cases wherein briefs that contained unverified and/or inaccurate citations had been filed in this Court and the District Court for the Southern District of Mississippi. The Firm represented that four of these cases were in the Northern District. That representation was inaccurate. In fact, the undersigned is aware of at least five other cases in this District wherein the Firm has admitted to improper AI usage in submitted filings. *See Duffy v. The Camp House LLC*, 1:25-CV-60-SA-DAS; *Davis v. City of Indianola, Mississippi*, 4:25-CV-34-SA-RP; *Strickland v. Mabus, LLC*, 1:25-CV-26-SA-DAS; *Moore v. Ashley Furniture Indus., LLC,* 1:23-CV-158-GHD; *Harris v. Nidec Motor Corp.*, 4:25-CV-16-DMB-JMV.

The Firm represented to the Court that it has taken corrective action in cases where unverified AI output was used. The Firm explained that it first worked to identify the problematic briefs and sought leave to file corrected memorandums in those cases. The Firm also informed opposing counsel in those cases and represented that no opposing counsel has raised an objection to their requests to file corrected briefs. The Firm also informed Billups of the unverified AI use

---

[4] Norris did not mention the drafting capabilities of "Archie" during the show cause hearing.

that caused the delay in his case. Lastly, Mr. Watson detailed his efforts of educating himself on AI including attending a recent seminar and downloading ABA seminars on the topic.

Following the hearing, Norris informed the Court via letter that the Firm dissolved effective on November 30, 2025, and that Billups has elected for Norris to continue to represent him in this case.

*Rule 11[5]*

"'[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus … streamline the administration and procedure of the federal courts.'" *Sec. & Exch. Comm'n v. Faulkner*, 2018 WL 3708426, at *2 (N.D. Tex. Aug. 3, 2018) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). In pertinent part, Rule 11 provides:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:… the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]

FED. R. CIV. P. 11(b)(2).

Accordingly, "[a]n attorney has a duty to conduct a 'reasonable inquiry into the facts and law of a case at the time [at] which she affixes her signature on any papers to the court.'" *Faulkner,* 2018 WL 3708426 at *2 (quoting *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001)). The Rule requires the signing attorney "to satisfy himself that the filed paper is factually and legally responsible," and by signing, he indicates "that he personally applied his own

---

[5] Although the Court is of the opinion that the subject conduct is sanctionable under its inherent authority, the Court need only rely on Rule 11 to impose the necessary sanctions in this case.

judgment." *Pavelic v. LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 125, 110 S. Ct. 456, 107 L. Ed. 2d 438 (1989). This is a "nondelegable duty." *Id.* at 126, 110 S. Ct. 456.

"An attorney's conduct is judged … with an objective, not a subjective, standard of reasonableness." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th Cir. 2016) (citing *Whitehead v. Food Max of Mississippi, Inc.*, 332 F.3d 796, 802 (5th Cir. 2003)). "'Reasonableness is reviewed according to the 'snapshot' rule, focusing upon the instant the attorney[s] affix[] [their] signature[s] to the document.'" *Id.* (quoting *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444 (5th Cir. 1992)). "In light of the objective standard of reasonableness applied under Rule 11, an attorney's subjective good faith is not enough to immunize [them] from sanctions based on a Rule 11 violation." *Dodson v. Nichols*, 2024 WL 4299023, at *4 (M.D. La. Sept. 26, 2024) (citing *Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988)).

"The district court is vested with considerable discretion in determining the 'appropriate' sanction to impose upon the violating party." *Thomas*, 836 F.2d at 877. "When Rule 11 has been violated, the court must 'carefully choose sanctions that foster the appropriate purpose of the rule, depending upon the parties, the violation, and nature of the case.'" *Faulkner,* 2018 WL 3708426 at *2 (quoting *Thomas*, 836 F.2d at 877). "The Fifth Circuit has held that the sanction imposed 'should be the least severe sanction adequate to [accomplish] the purpose of Rule 11.'" *Ferris v. Amazon.com Servs.*, 778 F. Supp. 3d 879, 881 (N.D. Miss. Apr. 16, 2025) (quoting *Thomas*, 836 F.2d at 878-79). A sanction imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(4). A court may consider a variety of factors including "whether [the sanctionable conduct]

was part of a pattern of activity, or an isolated event[.]" FED. R. CIV. P. 11, advisory committee's note to 1993 amendment.

*Analysis and Discussion*

There's a difference between a seasoned, good lawyer and somebody who uses AI to look like one. The Court reiterates that:

> AI is a powerful tool, that *when used prudently*, provides immense benefits. When used carelessly, it produces frustratingly realistic legal fiction that takes inordinately longer to respond to than create. While one party can create a fake legal brief at the click of a button, the opposing party and court must parse through the case names, citations, and points of law to determine which parts, if any, are true.

*Ferris*, 778 F. Supp. 3d at 881 (emphasis added).

This case presents a startling example of the harm unverified AI usage can cause. This Court has wasted significant time and efforts sorting through this Memorandum [65] which contains blatant misrepresentations. The Court is especially troubled that a firm and its attorneys, who appear in dozens of pending cases across this state, have utilized and relied on unverified AI usage to accomplish a portion of their litigation obligations. In determining whether a Rule 11 violation occurred, the Court will assess each attorney's conduct.

1. *Jane Watson*

Ms. Watson drafted, signed, and personally filed the Memorandum [65] at issue. She admitted that she used "Grok", an external AI tool, to assist in drafting and research without verifying the accuracy of the output. [77] at p. 12-13. At the hearing, Ms. Watson provided the Court with the following explanation for her actions:

> … I made a big mistake. I was lazy. I did not check my work. And I assumed what I used as a tool to help supplement my research to be accurate; and, upon further review, it's very clear that a lot of the cases are either hallucinated or they were misrepresented. . .

> And I have nothing more to say other than I -- I will never do it again. I've learned my lesson…
>
> [I]t's very pertinent for attorneys to…double-check these citations and to make sure they're correct…
>
> I'm new at this; I'm still learning. And I turned to AI to help me figure out how to do the ropes without trying to take too much time off my hands… It's not how lawyers should litigate…
>
> I will not make the mistake in not checking my citations again.

[77] at p. 6-7.

To state "the obvious, an attorney who submits fake cases clearly has not *read* those nonexistent cases, which is a violation of Rule 11 of the Federal Rules of Civil Procedure." *Willis v. U.S. Bank, N.A.*, 738 F. Supp. 3d 959, 960 (N.D. Tex. May 15, 2025) (citing *Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341, 343-44 (E.D. N.Y. Apr. 24, 2025)) (emphasis in original). The Court finds that, through Ms. Watson's own admission, she failed to verify the legal authorities generated by AI prior to filing the Memorandum [65] at issue. In failing to do so, she failed to "discharge [her] most basic responsibility as an attorney [] to make sure that the statements in the motion[] were true." *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1263 (N.D. Ala. July 23, 2025). This warrants Rule 11 sanctions. *See Willis*, 738 F. Supp. 3d at 960.

While Ms. Watson's misconduct in this case clearly violates Rule 11, the Court's analysis does not end here as it is compelled to point out Ms. Watson's troublesome pattern of conduct. *See* FED. R. CIV. P. 11, advisory committee's note to 1993 amendment (indicating that courts should consider whether the subject conduct was part of a "pattern of activity").

As of March 2025, Ms. Watson was on notice of her mistakes when an opposing attorney informed her directly that she had submitted a brief that contained misrepresentations of law. She was apparently then given an opportunity to fix the issue without consequence. Instead of learning

from her mistake, she failed to change her ways and continued the same practice of not verifying AI output—only then, her conduct additionally violated the Firm's policy prohibiting use of external AI tools.

The Response Memorandum [65] was filed on June 12, 2025, roughly three months *after* the initial notification from an opposing attorney in another case. That is particularly concerning. When asked about this continued unverified AI practice, Ms. Watson stated:

> I was told that I can't rely on [AI] to be forthright and have accurate case representations and citations, but there was nothing said about whether or not I could use it [to] enhance my writing, to make it be more succinct and more clerical…And, so far as not conferring with the policy, it wasn't totally outright not to use it. It was more of just, you know, you need to be careful in how you use it; and I failed to continue to conform to that.

[77] at p. 36-37.

Ms. Watson's response highlights her blatant disregard for the Firm's policy and the governing ethical standards of the legal profession. Whether she was allowed to use external AI to "enhance" her writing is irrelevant. She understood the policy banned reliance on AI legal research and blindly relied on it anyway. These violations encompass more than what Ms. Watson characterized as "nothing more than just [a] careless error on [her] end[.]" [77] at p. 7. Ms. Watson wholly integrated unverified AI usage into her practice of law in blatant disregard of the Firm's policy and her ethical obligations as an officer of the Court.

In light of repeated warnings from federal courts about the risk of hallucinated cases, as well as CLE trainings she attended, direct notice and knowledge of the same prior mistakes, her violation of the Firm's AI policy, and the sheer number of filings, Ms. Watson's misconduct is particularly egregious and prolific. The Court will consider all these variables in determining an appropriate sanction.

10

2. *Nick Norris*

For his part, Norris explained at the show cause hearing that he reviewed the Memorandum [65] for legal arguments but did not independently check the citations. Norris represented to the Court that he believes this practice is commonplace and that he was not aware he had a duty to go back and read every single case cited in the Memorandum [65]:

> I just assumed that when an attorney gave me a brief and [] the arguments are right in there - - it was just the wrong cases cited. I assumed they were correct. I did not understand, as a supervisory duty, that I have to go back and read every single case in the briefs . . . If the Court determines that it is [] part of my duty, I understand. I apologize. I just did not understand that was my duty.

[77] at p. 33.

In essence, Norris simply assumed the accuracy of the citations in the draft. Other courts have addressed (and rejected) this excuse *ad nauseum*. *See, e.g., Johnson*, 792 F. Supp. 3d at 1264 (holding attorney's obligation to check citations is not excused because he did not know co-counsel used generative AI); *Elizondo v. City of Laredo*, 2025 WL 2071072, at *3 (S.D. Tex. July 23, 2025) (finding law clerk's unsupervised AI use does not excuse attorney's failure to verify the cited authorities); *Park v. Kim*, 91 F. 4th 610, 615 (2d Cir. 2024) ("at the very least, the duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely"); *see also Mid Central Operating Engineers Health & Welfare Fund v. Hoosiervac LLC*, 2025 WL 574234, at *2-3 (S.D. Ind. Feb. 21, 2025) (finding AI-generated cases appearing valid did not relieve attorney of his duty to conduct a reasonable inquiry).

Norris is a signatory to the Memorandum [65] and admitted that he failed to check the citations. As stated above, an attorney's responsibility to review a legal filing for factual and legal

accuracy is "nondelegable." *Pavelic*, 493 U.S. at 126, 110 S. Ct. 456. The Court finds that Norris violated Rule 11.

Unlike in the cases cited above, Norris was on *actual* notice that Ms. Watson had previously used unverified generative AI. He even told Mr. Watson that "[i]f this ever happens again [Ms. Watson's AI usage], we're going to be where I'm standing today." [77] at p. 17. Despite having notice and appreciating the gravity of the situation, Norris continued to assume the accuracy of Ms. Watson's citations.

Further troubling is the ample opportunity Norris had to identify the errors. Norris explained:

> I did review the memorandum . . . I did not check the cites on it. There were several iterations of the Billups memorandum that I had Ms. Watson go back and change. There were what we contended were contradictions in it . . . [our] communications [were] mostly 30-minute to an hour-long phone calls, kind of going through all the contradictions I was trying to make sure were in and the arguments were properly made.

[77] at p. 31-32.

The Court is concerned at this oversight. As outlined in the attached case chart, a large portion of Billups' argument relies on a case styled *Jackson v. Gautreaux*, 3 F. 4th 182, 190 (5th Cir. 2021). *See* Appendix at p. 1-3. In fact, this case is cited eight times, even arguing that a jury should be instructed under its holding. *See* [65] at p. 20-21. In reality, *Jackson* is an excessive force and failure to train case and is wholly irrelevant to the case at bar.[6] A seasoned attorney examining the brief should have read a case so heavily relied upon. Had he done so, he would have easily discovered the problems. *See Johnson*, 792 F. Supp. 3d at 1262-63 ("Any reasonable investigation (indeed, even the most cursory of investigations, or a spot check) would have quickly revealed the

---

[6] Further, the pincite in the citation does not exist.

problem."). In light of how little effort would have been required to uncover this falsehood that permeated throughout the Memorandum [65], the Court is troubled by Norris' indifference to his professional responsibility.

Although Norris has appeared before this Court for years without issue, the Court simply cannot overlook this failure. The Court will sanction him accordingly.

3. *Louis Watson*

Mr. Watson did not draft, review, or sign the Memorandum [65] at issue. The Court finds that Mr. Watson did not individually violate Rule 11 as a signatory. Notwithstanding, as the Court will discuss *infra*, Mr. Watson is not absolved of responsibility. *See* FED. R. CIV. P. 11(c)(1).

As noted, while Mr. Watson is not usually involved with the bulk of the Firm's litigation, he is involved in every case. In fact, he appears as a signatory on the Complaint [1]. Despite not directly supervising Ms. Watson's day-to-day work, Mr. Watson acted as a supervisory attorney in many respects. In March 2025, he personally addressed the unverified AI use incident with Ms. Watson. After receiving a call from the opposing attorney, Norris explained:

> From there, I called Mr. Watson and told him about the issue and was very upset and told him [] this has got to be corrected immediately … Mr. Watson told me he would handle the issue and talk to her about it. And we discussed policies for using AI. Because, prior to that, we did not have a policy.

[77] at p. 17.

Mr. Watson acknowledged the role he played to this Court:

> The Court:     Mr. Watson, do you consider yourself a supervisory attorney?
>
> Mr. Watson:     Yes, Your Honor.

[77] at p. 34.

Mr. Watson, in recognition of his role, reported that he and Ms. Watson were in the process of self-reporting to the Mississippi Bar. Like Norris, the Court acknowledges that Mr. Watson has appeared before it for many years in good standing, but the Court cannot ignore what has occurred.

### 4. Watson & Norris, PLLC

Rule 11(c)(1) provides that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." FED. R. CIV. P. 11(c)(1). Again, Louis Watson, Jane Watson, and Nick Norris were the only attorneys practicing at Watson & Norris, PLLC during the relevant time period.[7] The Court does not find any exceptional circumstances that warrant the Firm's exemption from being held jointly responsible for the Rule 11 violations. *See Gonzalez Bank of Am., N.A. Hayman Bank of Am., N.A. Calidonio Deutsche Bank Nat'l Tr. Co. Jack Deutsche Bank Nat'l Tr. Co. Torok v. Wells Fargo Bank*, 2014 WL 12616132, at *6 (S.D. Tex. Aug. 5, 2014) (holding nine-attorney firm responsible for Rule 11 violations by three attorneys); *see also Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 499 (D. Wyoming Feb. 24, 2025) (acknowledging a firm can be held liable for Rule 11 violations by its members but ultimately declining to do so). Instead, the Court finds it appropriate to hold the Firm responsible.

In addition to the Firm's liability, the Court is concerned with how the Firm is handling the situation. The Show Cause Order [69] was issued September 11, 2025 and the hearing did not occur until October 24, 2025—giving the Firm almost six weeks to prepare. Despite ample time, Mr. Watson was learning of new cases involving unverified AI usage by the Firm on the morning of the hearing.

The Court questioned Mr. Watson:

---

[7] As noted earlier, Watson & Norris, PLLC was dissolved on November 30, 2025.

> The Court:     Mr. Watson, what steps, if any, has the firm taken to sanction or punish or address the wrongdoing of Ms. Watson?
>
> Mr. Watson:    Well, Your Honor, first of all, we try to get our hands around this situation, you know, to figure out how to correct it, what steps we needed to take. And that's when Mr. Norris and - - primarily Mr. Norris and myself and Ms. Watson have worked to identify the cases, first, where this issue existed.
>
> And, of those cases - - Mr. Norris mentioned there's ten of them. *I wasn't aware, until this morning, of the issue with the Megan Long case; so we haven't fully dealt with that yet.* But, the other cases - - I believe there are eight that we have filed motions to correct the briefs.

[77] at p. 24 (emphasis added).

In addition, Mr. Watson and Norris offered conflicting accounts regarding the number of cases in which they had sought leave to amend a tainted filing. For instance, the Court engaged in the following dialogue with Norris:

> The Court:     And I know you filed some motions for leave to file corrected memos. Have you filed -- has your firm filed leave for correcting in those ten cases?
>
> Mr. Norris:    In nine of the ten, there has been. I have a meeting set with a client on Tuesday at two o'clock. We have one issue in this case; it's Merit -- Megan Long v. Carrisus. And we have to put forward a correction to the defendant. And the defendant responded back that it needed us to correct a fact on top of it. And I needed to talk to my client before we change that fact, because I want to make sure it's right.

[77] at p. 21-22.

After Norris provided his explanation, Mr. Watson stated, "I believe there are eight cases that we have filed to correct the brief." *Id.* at 24. The Court finds this discrepancy troublesome, especially when considering other misstatements regarding the number of cases involving the same

15

issue. Specifically, as noted above, Norris represented there were "four cases in the Northern District we've had this issue with. The rest are in the Southern District." [77] at p. 20. In reality, the Court has identified six cases in the Northern District where the Firm has admitted that it submitted filings containing misrepresentations of law due to unverified AI usage.

Considering the ample time available to counsel to prepare for the hearing, the Court is especially troubled and finds that, at least at the time of the hearing, the Firm failed to even identify the reach of its harm. The Court will consider the Firm's attempted corrective action in determining appropriate sanctions.[8]

5. *LMSD*

The Court also observes that the Defendant, LMSD, could have flagged the fictious citation and misrepresentation of case law in a reply brief or supplemental filing. *See Ferris*, 778 F. Supp. 3d at 880-81 (opposing party alerted the court to hallucinated cases). The Court takes this opportunity to issue a charge. Going forward, the Court expects all parties to assist in maintaining the integrity of the judicial process and to be diligent in flagging AI misuse. "[O]therwise, the risk is too great that such errors will persist undetected, potentially leading to an outcome unsupported by law." *Elizondo*, 2025 WL 2071072 at *3.

*Sanctions*

This Court takes no pleasure in sanctioning attorneys who appear before it. However, the seriousness of the violations and the resulting waste of judicial resources demand sanctions to deter future violations. The Court appreciates the acceptance of responsibility and corrective measures but finds these efforts inadequate.

---

[8] The Court reiterates it may consider a "pattern of conduct" in determining appropriate sanctions. FED. R. CIV. P. 11, advisory committee's note to 1993.

Rule 11 assigns particular value to the deterrent function of a sanction. *See* FED. R. CIV. P. 11(c)(4) (providing that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated"). In addition, the Court is cognizant of the Fifth Circuit's directive to impose the least severe sanction(s) necessary to accomplish deterrence. *See Thomas*, 836 F.2d at 878-79.

The Court has surveyed the array of sanctions issued against attorneys who filed briefs containing misrepresentations due to unverified AI usage. Commonly, courts have imposed monetary sanctions ranging from $1,000 to $15,000. *See Benjamin*, 779 F. Supp. 3d at 347-48; *Wadsworth v. Walmart Inc.*, 348 F.R.D. at 498 ($3,000 fine against drafter of the brief with fake cases and $1,000 for other attorneys who signed, but did not draft brief); *Elizondo*, 2025 WL 2071072 at *3 ($2,500 fine); *Gauthier v. Goodyear Tire & Rubber Co.*, 2024 WL 4882651, at *3 (E.D. Tex. Nov. 25, 2024) ($2,000 fine); *Mid Central*, 2025 WL 574234 at *3 ($5,000 fine per filing with fake cases totaling $15,000).

In addition to monetary fines, courts have referred attorneys to the applicable disciplinary body for disciplinary proceedings. *See Benjamin*, 779 F. Supp. 3d at 348 (citing *Park*, 91 F. 4th at 615-16). Courts have required attorneys to provide a copy of a sanction order to their clients, opposing counsel, and the presiding judge in every pending state or federal case in which they are counsel of record. *See Johnson*, 792 F. Supp. 3d at 1267-68. Courts have also disqualified attorneys from further participation in the case and required attorneys to complete CLE courses on generative AI in the legal context. *See id.*; *see also Gauthier*, 2024 WL 4882651 at *3.

Having considered the potential sanctions, the Court finds the unique facts of this case render many of the lesser sanctions inadequate. Ms. Watson, Mr. Watson, and Norris have all already attended CLE trainings on the dangers of AI, self-reported to the Mississippi Bar, and

informed Billups of the AI misuse.[9] The Court also finds that a monetary fine would not have a meaningful deterrent effect. *See Johnson*, 792 F. Supp. 3d at 1266 ("If fines and public embarrassment were effective deterrents, there would not be so many [AI misuse] cases to cite."). Though addressed *ad nauseum*, the Court again emphasizes that the Firm was on notice of Ms. Watson's unverified AI usage in March of 2025, and its failure to adequately address the issue has resulted in a flood of tainted filings throughout this State. This has caused an unnecessary delay in litigation. For instance, after becoming aware of this issue in this particular case, the Court could not resolve the pending Motion for Summary Judgment [60] and continued all pretrial deadlines as well as the trial date until further Order. The case is at a standstill because of the egregious conduct at issue.

Considering all of these matters and bearing in mind its obligation to impose the least severe sanction necessary to deter future conduct, the Court first finds it appropriate to disqualify all three attorneys and their respective firms from further representation of Billups in this case.[10] The Court is aware that disqualification can cause hardship on the client and acknowledges that Billups' case has been unnecessarily delayed through no fault of his own. However, the Court finds disqualification would not cause any additional hardship, and "even if there is some minor hardship, it must yield to the seriousness of the misconduct here." *Id.* at 1267. Billups will be allowed 60 days within which to find new counsel to represent him in this case moving forward or advise the Court of his intent to proceed *pro se*.

---

[9] At the time of the hearing, Norris had not yet self-reported to the Mississippi Bar but Mr. Watson indicated Norris' intent to do so.
[10] This includes Norris, despite the fact that he has now opened a new law firm. That fact does not negate the Rule 11 violations he committed in this case.

Secondly, all members of the Firm are required to provide a copy of this Sanctions Order to all presiding judges in every pending state or federal case in which they are counsel of record.[11]

Thirdly, as ordered from the bench during the hearing, Ms. Watson must seek withdrawal in any case where she appears as attorney of record that is assigned to the undersigned. [77] at p. 37. She shall not enter an appearance in any other case assigned to the undersigned for a period of two (2) years from today's date.

Lastly, the Firm shall conduct an internal audit of all substantive filings on which Jane Watson is a signatory since she became an associate attorney with the Firm. The Firm must provide a report of the audit to this Court identifying: (1) every case in which Jane Watson is a signatory on any filing, (2) any fictious case citations and/or misrepresentations of case holdings in any filing, and (3) the corrective action that has been taken in each case. All three attorneys shall certify under oath that they reviewed all filings and identified all fictitious case citations and/or misrepresentations to the best of their ability. This audit report should be emailed to this Court at Judge_Aycock@msnd.uscourts.gov. Should this audit not be completed and/or be completed improperly, the Court will consider the same to be further sanctionable conduct.[12]

In light of the serious and prolific nature of the offense, the Court finds these sanctions to be the least severe to accomplish deterrence. Courts across the country are faced with the arduous task of upholding judicial integrity in the age of AI. Attorneys and *pro se* litigants alike are

---

[11] For federal district court cases, this mandate encompasses both the assigned district judge *and* magistrate judge on each case. It also includes all appellate judges assigned to any case that is currently pending in state or federal court. This is a continuing duty as to all cases that are currently pending.

[12] This audit is limited to cases where Jane Watson is a signatory on any filing. The Court recognizes, though, that Norris was also a signatory in this case. However, as the Court understood his explanation at the show cause hearing, Norris has not utilized AI in drafting legal briefs for filing. If such is the case, the Court directs Norris to submit to the Court an affidavit verifying the same. If the Court is incorrect in that assumption, the audit requirement is hereby extended to all cases in which Norris has been a signatory on any filing within the last two years.

19

bombarding courts with fictious filings that drain the Court's limited resources. At the end of the day, it is not the Court who is the victim but the people whose day in court is endlessly delayed. This cannot continue.

*Conclusion*

For the reasons set forth above, the Court issues **SANCTIONS** as follows:

1. Ms. Watson, Mr. Watson, and Norris are **ORDERED** to provide a copy of this Sanctions Order to the presiding judge in every pending state or federal case in which any of them are counsel of record. They must comply with this requirement within 30 days of today's date and certify to the Court that they have done so by filing a Notice indicating that they have done so on the docket within 7 days of completing the requirement;

2. Nick Norris is **DISQUALIFIED** from further participation in this case;

3. Jane Watson is **DISQUALIFIED** from further participation in this case;

4. Jane Watson is **ORDERED** to seek withdrawal from any case where she appears as attorney of record that is assigned to the undersigned and shall not enter an appearance in any other case assigned to the undersigned for a period of two (2) years from today's date;

5. Louis Watson is **DISQUALIFIED** from further participation in this case;

6. The Court **DIRECTS** the Clerk of Court to send a copy of this Sanctions Order to the Mississippi Bar; and

7. The Firm is **ORDERED** to conduct an internal audit as described herein and submit the ordered information to this Court within 60 days of today's date.

This case is hereby STAYED for a period of 60 days to provide Billups an opportunity to obtain new counsel. The Court trusts that Norris will immediately advise Billups of the disqualification. The Court also directs Norris to provide the Court (via email) with the contact

information of Billups so that, in the event he does not take action within 60 days, the Court can communicate with him directly and take appropriate action.[13]

     SO ORDERED, this the 19th day of December, 2025.

                            /s/ Sharion Aycock
                            SENIOR UNITED STATES DISTRICT JUDGE

---

[13] Ms. Watson and Mr. Watson's respective Motions to Withdraw as Counsel [76, 78] are DENIED AS MOOT.