IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

THOMAS BILLUPS                                                                                PLAINTIFF

v.                                                                      CIVIL ACTION NO. 1:24-CV-74-SA-DAS

LOUISVILLE MUNICIPAL SCHOOL DISTRICT                                          DEFENDANT

ORDER AND MEMORANDUM OPINION

On April 19, 2024, Thomas Billups initiated this action by filing his Complaint [1] against the Louisville Municipal School District ("LMSD"). Billups brings an age discrimination claim under the Age Discrimination in Employment Act of 1967 ("ADEA"). Before the Court is LMSD's Motion for Summary Judgment [60]. The Motion [60] has been fully briefed and is ripe for review. Having considered the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

Billups is a 71-year-old basketball coach from Louisville, Mississippi. He spent the majority of his career as a boys basketball coach at Lanier High School in Jackson, Mississippi. During his career, he amassed nine state championships with three different schools. Following his high school coaching career, Billups served as the head basketball coach (and later as an assistant basketball coach) at Tougaloo College, where he won three conference championships. Despite spending most of his career in Jackson, Billups remained active in the Louisville community as a member of "Trojans 4 Life," a club of alumni who mentor and support students at Louisville High School.[1]

---

[1] Members of "Trojans 4 Life" are comprised of alumni from Camille Street School and Louisville High School. Camille Street School was an all-Black school that closed in 1970 when it integrated with Louisville High School.

In spring 2023, Louisville High School's then-head boys basketball coach, Collin Tippett, informed the school's Athletic Director, Tyrone Shorter, that he would resign at the end of the school year. Billups, through his involvement with "Trojans 4 Life," learned of Tippett's resignation.[2] Upon learning this, Billups alleges that he called Louisville High School Principal, Danya Turner, and that Turner told him the position was "open" and "you can put your application in." [60], Ex. 5 at p. 26-27.[3]

On April 8, 2023, Billups applied for the boys basketball coach position via online application. At the time of his application, he was 70 years old. Thereafter, on April 10, 2023, Billups dropped off a hardcopy of his resume and application in person at the school and spoke with Turner expressing his interest in the position.[4] Additionally, members from "Trojans 4 Life," on a separate occasion, met with Turner and advocated for Billups to be hired.

LMSD has in place an internal hiring policy, which required Louisville High School to first consider candidates that already worked at the school. Under the policy, once internal candidates were exhausted, the search would widen to candidates within the district before publicly announcing the vacancy and taking external applications. The existence of the internal hiring policy is not in dispute, but the parties disagree as to whether it was followed during the head boys basketball coach search. At no point did Turner or Shorter inform Billups or any member of "Trojans 4 Life" of this policy. Instead, Turner admitted to telling "Trojan 4 Life" members, "we are going to select the best person for the job." *Id.*, Ex. 2 at p. 16, 24-25; [60], Ex. 1 at p. 33-34.

---

[2] Shorter is referred to as Athletic Director Shorter and Coach Shorter interchangeably throughout the relevant briefings and depositions.

[3] Turner disputes this call ever happened. Instead, he claims that Billups left him a voicemail expressing interest in the position on a later date after Billups dropped off his resume at the school.

[4] Turner disputes Billups' timeline. Rather than seeing Billups on the day he dropped off his resume, Turner claims Billups came back to the school the day after to express interest in the position.

LMSD ultimately hired James McCurry, the then-girls basketball coach and unofficial boys assistant coach, for the position. At the time, McCurry was 34 years old. McCurry was the only candidate who was interviewed for the job.

Turner and Shorter conducted McCurry's interview and subsequently recommended his hiring to the Superintendent, Dr. David Luke. In support of their recommendation, Turner and Shorter cited McCurry's internal status, team familiarity, and coaching achievements. Dr. Luke subsequently submitted McMurry's candidacy to the School Board for approval. On May 9, 2023, the School Board approved McCurry as the new head boys basketball coach.

Following the news of McCurry's hiring, Billups called Turner, inquired about the hiring decision, and made an accusation of age discrimination. After the phone call, Billups learned of a conversation that had occurred between Shorter and the school's then-Band Director Tommie Dorris concerning Billups' candidacy. During his deposition, Dorris testified that—prior to Shorter and Turner recommending McCurry—he asked Shorter whether the school planned to hire Billups. According to Dorris, Shorter stated, "No, I think he's too old" referring to Billups. [64], Ex. 2 at p. 15. Dorris testified that he then asked why the school did not want to hire Billups, to which Shorter responded "Well, he's old. I mean, he needs to perhaps go home and retire." *Id*.

Thereafter, Billups filed an EEOC Charge, alleging that LMSD discriminated against him on the basis of age in its hiring decision. He received a right to sue letter on January 25, 2024. Through its present Motion [60], LMSD seeks summary judgment as to Billups' claim.[5]

---

[5] The Court notes that Billups' original counsel were disqualified due to unverified artificial intelligence used in their Response Memorandum [65]. *See* [79]. Importantly, the undisputed factual allegations remained the same and unchanged. Following that disqualification, Billups obtained new counsel, and the Court permitted Billups to file a corrected memorandum. *See* [87]. That Response Memorandum [88] and LMSD's Reply [91] are now the operative briefings. In addition, the Court allowed Billups' new counsel to submit a Supplemental Brief [92].

*Legal Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at \*1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at \*1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

4

*Analysis and Discussion*

In his Complaint [1], Billups alleges that LMSD "discriminated against [him] because of [his] age." [1] at p. 4. The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

To establish an ADEA claim, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). Because direct evidence is rare, a plaintiff ordinarily points to circumstantial evidence and courts apply the familiar *McDonnell Douglas* framework in analyzing the claim. *See Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994). The *McDonnell Douglas* test establishes a *prima facie* case by inference, but it is not the exclusive method for proving intentional discrimination. *Id*. However, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id*. (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1984)).

Billups argues that Shorter's age-related comments to Dorris constitute direct evidence of discrimination sufficient to preclude summary judgment. LMSD argues Shorter's comments to Dorris were "stray remarks" and that Billups has only presented circumstantial evidence that is subject to a *McDonell Douglas* analysis. First, the Court determines whether Shorter's comments constitute direct evidence of discrimination.

I.     *Direct Evidence*

"Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 2010). The Fifth Circuit has explained that comments constitute direct evidence of discrimination only if they meet a four-factor criteria. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010). Specifically, the comment(s) must be "(1) related to the protected class of persons of which the plaintiff is a member, (2) proximate in time to the complained-of adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue." *Id*. (quoting *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000)).

Comments that do not meet these criteria are considered "stray remarks," and standing alone, are insufficient to defeat summary judgment but instead are taken into account as part of the circumstantial evidence analysis. *Id*. Importantly, where comments are offered as *circumstantial* evidence, a plaintiff need only "show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Goudeau v. Nat'l Varco, L.P.*, 793 F.3d 470, 475-76 (5th Cir. 2015) (citing *Squyres v. Heico Co., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015)) (additional citation omitted).

Billups contends that Shorter's alleged comments to Dorris that Billups was "too old" and "needs to perhaps go home and retire" sufficiently prove the existence of discriminatory animus without the need for inference or presumption, and that the same create a genuine dispute of material fact for trial. For the sake of clarity and context, the Court recites the relevant portion of Dorris' deposition:

A.   But there was one occasion that all of us – Coach Shorter and some of the other coaches, some of the sports – I just happened to stop by on my way to my apartment . . .

Basketball season was wrapping up, pretty much, and they was trying to decide who they were going to hire. Coach Shorter, myself, and some of the other coaches was in front of the field house – outside the football field house. So we had a conversation.

And I just – I just asked – I said, "Who are y'all going to hire? Y'all going to get Coach Billups?" He said, "No. I think he's too old."

Q.   Who said that?

A.   Coach Shorter.

Q.   Okay.

A.   . . . [I]n reply, I said, "Well, maybe I'm too old, because I've [been] doing this for 29 years." He said, "No. No. I don't think so." I said, "Well, why would you not want to hire him?"

"Well, he's old. I mean, he needs to perhaps go home and retire." I mean, just conversations like that. No[t], verbatim, I can't remember everything, but I do remember that. Because my reply was, "Maybe I'm too old for this job, too."

[64], Ex. 2 at p. 14-15.

The Court notes that LMSD did not address Shorter's comments in its initial Memorandum [61]; however, it did so in its Reply [91]. There, LMSD only addresses factor three of the direct evidence inquiry, arguing that Shorter was not an individual with authority over the hiring decision. LMSD does not contest the other factors for purposes of summary judgment.

As to the third factor, LMSD's primary argument is that the School Board—not Shorter—had the final authority to make hiring decisions.[6] As to this argument, LMSD relies on Mississippi

---

[6] LMSD makes a secondary argument that Shorter was, at most merely "involved," with the hiring decision. [91] at p. 3 The Court need not address this argument as it finds LMSD's primary argument persuasive.

7

Code Section 37-9-17(1), which provides that the principal shall make employment recommendations to the superintendent who then, in turn, approves and submits the recommendation to the School Board for final approval. *See* MISS CODE. ANN. § 37-9-17(1). The statute also provides that the School Board should approve the recommended employee "unless good reason to the contrary exists" and if declined, then additional recommendations by the principal and superintendent shall be made under the same process. *Id.* In essence, the School Board can only consider employment recommendations first submitted by the principal and then approved and presented by the superintendent. Notably absent is any mention of the athletic director's role in the hiring process.

In response, Billups does not contest that the School Board had the final authority over employment decisions; instead, he urges the Court to apply a "cat's paw" analysis and impute Shorter's "discriminatory animus" on the School Board. [92] at p. 5.[7] In making this argument, Billups relies on *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000).

In *Russell*, the Fifth Circuit held that "[i]f the employee can demonstrate that others had *influence or leverage over the official decisionmaker* . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker." *Id.* (emphasis added). Simply stated, Billups' reliance on *Russell* is misplaced. As noted previously, the "influence or leverage over the official decisionmaker" analysis applies to the second prong of the *circumstantial* evidence analysis, not to the Court's consideration of direct evidence. The Court notes that *Russell*, arguably, does not clearly differentiate between circumstantial and direct evidence when applying the "influence or leverage" analysis. *Russell*, 235 F.3d at 227. However, subsequent Fifth Circuit decisions applying

---

[7] In its Supplemental Response [96], LMSD argues that Billups waived its "cat's paw" argument because it did not raise it in its initial Response Memorandum [88]. Without deciding the issue, the Court will consider the "cat's paw" theory as it does not alter the ultimate outcome.

*Russell* has held that the "influence or leverage" analysis only applies in a circumstantial evidence case. *See Goudeau*, 793 F.3d at 475-476 (citing *Russell*, 235 F.3d at 226); *see also Reed v. Neopost USA, Inc.*, 701 F.3d, 441-442 (5th Cir. 2012). In sum, it appears Billups is asking the Court to apply the "more flexible" circumstantial evidence standard to direct evidence. The Court declines to do so.

Having considered Billups' arguments pertaining to direct evidence, the Court finds that he cannot show that Shorter had authority over the hiring decision. As such, Shorter's comments are insufficient, on their own, to preclude summary judgment. *Jackson*, 602 F.3d at 380. The Court now turns to the *McDonnell Douglas* framework.[8]

II.     *Circumstantial Evidence*

Where a plaintiff relies on circumstantial evidence to prove his age discrimination claim, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *Moss*, 610 F.3d at 922 (5th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under that framework, a plaintiff must first establish a *prima facie* case, then, if the plaintiff does, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Moss*, 610 F.3d at 922 (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)).

If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the provided reason is "merely pretextual." *Id*. (citing *Jackson*, 602 F.3d at 378-79). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id*. (internal quotation marks omitted).

---

[8] Billups makes some argument that *McDonnell Douglas* is not the "exclusive" method to prove discrimination in an employment law case. [92] at p. 1-4. The Court declines to apply any other methodology at this time. The Court's rejection of this argument has no consequence to the outcome of the instant ruling.

Importantly, the ADEA requires a plaintiff to prove that age was the 'but-for' cause of the challenged employer decision. *Gross*, 557 U.S. at 180, 129 S. Ct. 2343.

### a. Prima Facie Case

To establish a *prima facie* claim of age discrimination under a failure-to-hire theory, Billups must show that: "(1) he belongs to a protected class; (2) he applied for and was qualified for a position that was seeking applicants; (3) he was rejected; and (4) following his rejection, another applicant not of the protected class was hired*." McDaniel v. Nat'l R.R. Corp.*, 705 Fed. App'x. 240, 245 (5th Cir. 2017) (citing *Haas v. ADVO Sys. Inc.*, 168 F.3d 732, 733 (5th Cir. 1999)).

For purposes of summary judgment, LMSD only contests the second element. LMSD argues that Billups cannot establish a *prima facie* case because (1) it was not seeking applicants for the head boys basketball coaching position, and (2) Billups never applied for the position. The Court will address these contentions separately.

### i. Whether LMSD was seeking applicants for the head boys basketball coaching job

First, LMSD argues that Billups cannot make a *prima facie* case because it was not seeking applicants for the head boys basketball coach position. LMSD's primary argument on this point is that it followed a district policy to prioritize internal candidates before considering external candidates.

In support of this position, LMSD emphasizes the uncontroverted fact that it never posted a job opening or announced the vacancy, and that Billups only learned about the opening through his involvement with "Trojans 4 Life." In addition, LMSD alleges that when other external applicants reached out about the job, it informed them if/when the job was opened to applicants, then a resume could be sent in to be considered. Lastly, LMSD also points out that it did not seek applications from the internal candidates it considered for the position.

In response, Billups argues that LMSD was *de facto* seeking applicants. The record shows that Turner told Billups he could put in an application and that Billups in fact did submit an online application and then dropped off a copy of his resume at the school. Billups testified about a phone conversation he had with Turner about the position:

> Q.     Okay. And so how did you find out that there was a vacancy or going to be a vacancy at the high school here at Louisville High School, the vacancy for the basketball coach?
>
> A.     . . . Trojans 4 Life told me about it. And I called the principal, Mr. Turner, when it came open [coaching vacancy]; and he told me – he told me, Yeah, Coach, it's open. I said, Well, can I put an application in? He said, Yeah, you can put your application in. I got some other applications also.

[60], Ex. 5 at p. 8.[9]

After this conversation, Billups dropped off a resume in person and spoke to Turner about the position but was never informed of the school's internal hiring policy. [60], Ex. 2 at p. 24-25. Later, a group from "Trojans 4 Life" met with Turner advocating for the hiring of Billups and were told "we're [Turner and Shorter] going to . . . select the best person for the job." Again, there was no mention of the school's internal hiring policy. *Id.* at p. 6-7.

The Court, viewing these facts in light most favorable to Billups, finds he has come forward with summary judgment evidence to create a question of fact as to whether LMSD was seeking applicants for the coaching vacancy.

### ii.     Whether Billups applied for the position

Next, in the alternative, LMSD argues that Billups never submitted a complete or valid application. In support of its position, LMSD highlights the fact that Billups only filled out a general employment application that indicated interest in a "coaching" job but did not specify the

---

[9] As noted previously, Turner disputes that this call occurred.

boys basketball coaching job. LMSD also points out that Billups's application failed to include a copy of his college transcript or a copy of a valid teaching license as required.[10] Lastly, LMSD's Handbook requires applications to be completed online.

In response, Billups points to the fact that Turner accepted his resume and application without objection. In fact, Turner and Shorter both admitted to reviewing Billups' resume. Shorter testified that "[Billups'] resume was impressive" and his only concern was "[Billups] coming back into the classroom." [60], Ex. 1 at p. 16-17. Turner testified, "I didn't see anything that concerned me . . . [Billups] is a very successful coach." *Id.*, Ex. 2 at p. 19. Billups contends that this acceptance, coupled with Turner and Shorter's discussions about his resume, indicates LMSD treated his application as valid.[11] At no point in their depositions did either Turner or Shorter testify that Billups' application was incomplete.

Considering these facts in the light most favorable to Billups, the Court concludes that a reasonably jury could find that LMSD treated Billups' application as valid. For the purposes of summary judgement, Billups has met his burden to establish a *prima facie* case of age discrimination.

b. *Legitimate, Non-discriminatory Reasons*

The burden now shifts to LMSD to provide a legitimate, non-discriminatory reason for the employment decision. *See Moss*, 610 F.3d at 922. At this stage, LMSD's burden is simply to produce "evidence, which taken as true, would permit the conclusion that there was a non-discriminatory reason for the adverse action." *Ruth v. Eka Chemicals, Inc.*, 92 F. Supp. 3d 526, 531 (N.D. Miss. Feb. 17, 2015) (quoting *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir.

---

[10] LMSD offers the invalid application argument exclusively to negate the *prima facie* case and does not proffer it as a non-discriminatory reason for failing to hire Billups. [91] at p. 13.

[11] Billups also emphasizes that the LMSD Personnel Handbook does not mandate disqualification of candidates for incomplete applications.

12

2002)) (additional citation and emphasis omitted). LMSD proffers two non-discriminatory reasons for failing to hire/interview Billups: (1) LMSD only considered internal employees for the boys basketball head coaching job, and (2) Coach McCurry was the most qualified for the job.

Importantly, LMSD is "not required to persuade the court that it was actually motivated by the proffered reasons . . . It must only clearly set forth, through the introduction of admissible evidence, the reasons for its decision." *Ruth*, 92 F. Supp. 3d at 532 (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 901 (5th Cir. 2012)) (additional citation and internal quotation marks omitted). This step involves no credibility assessment. *Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224, 236 (5th Cir. 2016). For summary judgment purposes, LMSD has satisfied its burden.

### c. *Pretext*

The burden now shifts back to Billups to establish pretext. *See Moss*, 610 F.3d at 922. "At the third step, the employee must produce evidence, or rely on evidence already produced, that refutes or contests the employer's evidence of a legitimate, nondiscriminatory reason. Stated differently, the employee must produce or rely upon evidence that the employer's legitimate, non-discriminatory reason was only a pretext—that is, a false or weak reason . . . advanced to hide the actual . . . reason." *Heinsohn*, 832 F.3d at 236-237 (citing BLACK'S LAW DICTIONARY (defining 'pretext')) (additional citation omitted).

In his Response Memorandum [88], Billups argues LMSD's legitimate non-discriminatory reasons are pretextual, specifically asserting that: (1) LMSD submitted misleading EEOC representations and a contradictory litigation stance; (2) LMSD did not follow its internal hiring policy during the head boys basketball coach search; (3) Billups was the most qualified candidate; and (4) Shorter made discriminatory statements about Billups' age. The Court will address each argument in turn.

    i.   *LMSD's EEOC representations and contradictory litigation stance*

Billups first argues that differences between LMSD's EEOC Position Statement and its litigation stance, combined with discovery evidence, raise questions about the consistency of LMSD's representations and support an inference of pretext. In support of this position, Billups provides two specific examples.

First, Billups highlights LMSD's statement to the EEOC that "no vacancy was declared as the High School Principal and Athletic Director identified an internal candidate to fulfill the position." [64], Ex. 3 at p. 1. Billups argues that LMSD's failure to mention his application is indicative of pretext. In response, LMSD points to its formal hiring policy that only requires consideration of external candidates once a vacancy is declared, which never happened here.

Second, Billups emphasizes that LMSD's additional arguments that Billups' teaching license was expired and that his coaching style was too aggressive were absent from the EEOC Position Statement. In other words, these arguments appear, in Billups' view, to be post-hoc rationalizations. LMSD maintains it never wavered from its internal hiring policy justification, and the additional arguments are supplemental and consistent with it. *See generally Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 Fed. App'x. 425 (5th Cir. 2016).

Simply stated, LMSD's litigation stance is that it was only considering internal candidates, and even if not, Billups would not be considered because of his invalid teaching license and aggressive coaching style.

In an analogous case, *Bennett*, the defendant listed in its EEOC position statement that the plaintiff was "terminated due to her poor performance and failure to perform the assigned work— *not for any other reason*." *Id*. at 430 (emphasis added). During litigation, the defendant offered

14

additional factors supporting termination including "receipt of personal phone calls and visitors at work, her failure to be punctual, and her unproductiveness." *Id*. The plaintiff argued that the additional termination factors were inconsistent and sufficient to carry her burden of showing pretext. *Id*. The Fifth Circuit noted that it "ha[s] never held that an employer giving additional reasons to the district court to supplement those given to the EEOC supports an inference of pretext." *Id*. at 431. The Fifth Circuit emphasized that the additional reasons were not actually inconsistent with the reason given to the EEOC and found additional arguments brought up in litigation supplemental despite the EEOC statement explicitly stating the plaintiff was fired for performance and "no other reason." *Id.*

Similar to *Bennett*, the additional reasons for not hiring Billups are not inconsistent with the reason given to the EEOC. Both Turner, through a summer camp hosted at Louisville High School in which Billups was involved, and Shorter, as an attendee at a high school playoff game where Billups was the coach, testified they were personally familiar with Billups' aggressive coaching style. [60], Ex. 2 at p. 7; [60], Ex. 1 at p. 10. Further, Billups included an expired teaching license when he dropped off his resume. [60], Ex. 2 at p. 6. The fact Turner and Shorter had personal knowledge of other reasons does not contradict the internal hiring policy reason given to the EEOC.

The fact that LMSD only included its internal hiring policy in its EEOC statement as a reason for not hiring/interviewing Billups does not mean it cannot offer additional, supplemental reasons during litigation. Here, the Court agrees with LMSD and finds that the additional reasons for not hiring Billups provided during litigation are supplemental and not indicative of pretext.

   ii.      *Inconsistent application of the internal hiring policy*

Next, Billups argues that LMSD deviated from its internal hiring policy. A plaintiff can demonstrate pretext by showing that the employer departed from a standard procedure in making the adverse employment decision. *McMichael*, 934 F.3d at 459. However, mere deviations from policy do not show pretext. *Id*. In order to succeed on a departure-from-procedure argument, a plaintiff must show a connection between the departure from procedure and a discriminatory motive. *Id*. In support of his position, Billups contends LMSD did not apply the internal policy during the head boys basketball coach search and used it as a post-hoc justification to exclude him. In response, LMSD again argues it followed its internal hiring policy and that there is no evidence in the record that it accepted and considered external applications.

For the sake of clarity, the Court recites testimony of Dr. Luke describing the policy. In his deposition, Dr. Luke testified:

> Q. Okay. So is there any sort of requirement that if a position is open within your district that you have to advertise and open it up to the public?
>
> A. Again, our standard policy is the first thing that when we have any position open is we're going to look internal. And when I say "internal," we're going to look inside that school.
>
> . . .
>
> Whatever school has an opening they're going to look inside their building or their campus and to see if there's some moving, some shifting that they [can] do with their building or promoting, whatever it might be.
>
> Once that's exhausted, they will go sort of district-wide internally and look to see if there's other people in the district that would, you now, benefit from a move and plus benefit the school that they're being – would be moving to.
> And then once all of those resources are exhausted outside the district we post it publicly, and we take in applications from the outside.

[60], Ex. 4 at p. 6-7.

16

Turner and Shorter's references to the policy are consistent with Dr. Luke's description. Despite this policy, the record shows that Billups *was* considered for the coaching vacancy. Turner and Shorter had conversations about Billups filling the coaching position. In his deposition, Turner testified:

> Q. After getting the packet, did you and Coach Shorter discuss Coach Billups applying for the position?
>
> A. Like I said, we – he – I told him that he had came by. And told him that he was interested, and I asked Coach Shorter that – I told him I had gotten a phone call and that some Trojans 4 Life had came by.
>
> And he told me the exact same thing. He had gotten the same phone calls. They visited him. You know, just – you know, they made the rounds, if I can just say that. Yeah. Yeah.
>
> Q. Did Coach Shorter express to you any reservations about or concerns about hiring Coach Billups for the position?
>
> A. During our conversation, we talked about the coaching style. That was the only reserv[ation] that we, you know, both had was [Billups'] coaching style.

*Id.*, Ex. 2 at p. 6.

Second, the record shows that Turner reviewed and considered Billups' resume. Turner testified:

> Q. Did you look at Coach Billups' resum[e]?
>
> A. I did. I did. I did look at it. Yes, ma'am.
>
> Q. And did you see any red flags or anything that concerned you?
>
> A. No. I didn't see anything that concerned me. No. I mean, nothing that just jumped off the page, you know. He is a very successful coach. He is.

*Id.*

Next, the record shows that Turner checked to see if Billups' teaching license was active.

Shorter testified:

> Q.    And my understanding is that one of the issues you had was you had pulled and checked to see if his education [teaching] license was still active?

> A.    Well, Mr. Turner did. Mr. Turner told me that his license wasn't valid at the time.

*Id.*, Ex. 1 at p. 8.

Shorter also admitted, and later backtracked, that he suspected if they hired Billups, he would not remain in the position long term. Shorter testified:

> Q.    Okay. Did you have any suspicion that he wasn't going to be there long term?

> A.    You know, to be honest, yes, I felt like, you know, if -- you know, he might not be there long term . . .

*Id.* at p. 7.

Lastly, Turner received a phone call from a School Board member, Brenda Johnson, informing him that Billups was interested in the coaching position.

> Q.    Okay. I think you mentioned the board member, Ms. Johnson --

> A.    Uh-huh (affirmative response)

> Q.    -- contacting you

> A.    Uh-huh (affirmative response)

> Q.    And she mentioned that Coach Billups was applying. Did she ever talk to you . . . to encourage you to hire Coach Billups.

> A.    No. She just told me he was interested. She didn't say he was applying.

> . . .
>
> Q.    Did you tell – well, let me ask. When Brenda Johnson told you, hey, Coach Billups has expressed an – maybe expressing an interest, did you tell her, "We're not interested. We're only looking internally right now"?
>
> A.    I didn't tell her anything. I just said, "Yes, ma'am," when she told me that he was interested.

*Id.*, Ex. 2 at p. 7.

Overall, the above testimony supports that Turner and Shorter considered hiring Billups—a clear deviation from the internal hiring policy. Billups' resume was reviewed, his teaching license checked, his coaching style discussed, and a School Board member called Turner to advocate on his behalf.

Again, though, a plaintiff making a departure-from-policy argument must connect the deviation to a discriminatory animus. *McMichael*, 934 F.3d at 459. As noted previously, there is evidence in the record that Shorter commented that Billups was "too old" to another employee and that he was concerned about a potential short tenure if Billups was selected for the position. [64], Ex. 2 at p. 14; [60], Ex. 1 at p. 7. Viewing the evidence as a whole in the light most favorable to Billups, a reasonable jury could find that there is a connection between the departure from procedure to a discriminatory motive. Overall, this evidence creates a question of fact as to whether the internal hiring policy was the reason Billups was not considered or whether it was a pretext for discrimination.

### iii. Billups' qualifications

Next, Billups attempts to show pretext by arguing he was clearly better qualified than McCurry. To show that he was "clearly better qualified" and raise a question of fact as to pretext, Billups must show that "the qualifications are so widely disparate that no reasonable employer

would have made the same decision." *Moss*, 610 F.3d at 923 (quoting *Deines v. Texas Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999)). Relevant, more years of service do not make an applicant clearly better qualified. Employers may prioritize specific qualifications over general qualifications and years of service. *Martinez v. Tex. Workforce Comm'n-Civil Rts. Div.*, 775 F.3d 685, 688 (5th Cir. 2014). "[T]he bar is set high for this kind of evidence" and "differences in qualifications are generally not probative evidence of discrimination[.]" *Moss*, 610 F.3d at 923 (quoting *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001)).[12]

In support of his argument, Billups cites his resume which includes over twenty-five years of coaching experience, multiple state championships, community ties, and Dr. Luke's testimony that the team faced "stumbling blocks" under McCurry. [60], Ex. 4 at p. 10.[13] In response, LMSD proffered McCurry's resume which included eight years of coaching experience, a girls basketball state championship at Louisville High School, his time as the unofficial assistant coach to the boys basketball team, his abilities as a classroom teacher, his endorsement by current boys basketball team members, and his coaching style.

Objectively comparing the two, Billups and McCurry both have the basic skills and education requirements for the job. Both have a master's degree, coaching experience, and coaching achievements. While Billups may have better "general qualifications" like more years coaching and more state championships, LMSD points to valid "specific qualifications" like McCurry's relationship with the players, parents, and school and his ability to teach a multitude of different subjects.

---

[12] To be clear, showing that a plaintiff is "clearly better qualified" is one way of demonstrating pretext, but *not* the only way. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 n. 11 (5th Cir. 2007).

[13] The Court need not address the last point as the only relevant consideration is if Billups was clearly better qualified at the time of the hiring decision.

20

Under a "clearly better qualified" theory, Billups failed to submit sufficient evidence to support that no reasonable employer would have chosen McCurry for the job. Thus, Billups' qualifications are not "so widely disparate" to indicate pretext for discrimination. *Moss*, 610 F.3d at 923 (citation omitted).

### iv. *Shorter's statements about Billups age*

Lastly, Billups' argues that Shorter's age-based comments during the hiring process are evidence that LMSD's non-discriminatory explanations for its hiring decision are pretextual. As noted previously, in a circumstantial evidence case, as opposed to a direct evidence case, discriminatory remarks are considered under a "more flexible" standard. *Allen*, 63 F.4th at 302 (citation omitted). As noted previously, to be relevant evidence considered as part of a broader circumstantial case, "the comments must show: '(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.'" *Id*.

Billups argues Shorter's statements are highly probative of pretext, reflecting an age-based animus by a key decision-maker. In response, LMSD does not contest Shorter's statements could be indicative of discriminatory animus; instead, it argues there is no evidence that Shorter was primarily responsible for the challenged employment decision or that he had influence or leverage over Turner, Dr. Luke, or the School Board's decision. Thus, the only question that remains is whether Shorter had influence or leverage over the relevant decisionmaker.

In *Palasota*, a plaintiff brought a claim for age discrimination under the ADEA after he was terminated and subsequently replaced by a younger salesperson. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 572 (5th Cir. 2003). To support his claim, the plaintiff presented evidence of two comments made by upper management in a sales meeting. *Id.* at 573. First, President Frank

21

Bracken stated that he wanted "race horses" and not "plow horses" and, second, National Sales Manager Alan Burks stated "we've got an ageing, graying sales force out there . . . and we've got to figure out a way to get through it." *Id.* The Fifth Circuit held that a discriminatory comment, even when not in the direct context of termination, constitutes circumstantial evidence "where the comment is . . . uttered by one other than the formal decisionmaker, provided that the individual is in a position to influence the decision." *Id.* at 578 (citing *Russell*, 235 F.3d at 229). The Fifth Circuit found that Bracken and Burks, as members of upper management, were in such a position to influence the decision. *Id.*

*Palasota* is, in many respects, analogous to the case *sub judice*. In his deposition, Dr. Luke admitted to delegating the hiring decision almost entirely to the principals in his district:

> Q. So as superintendent, do you get heavily involved in the hiring process?
>
> A. Our standard operating procedure on hiring is done at the building levels, so, you know, and that's the reason I pay my head principals. This is their job, and it lends on my level to the accountability. If I'm hiring for individual schools then how do I hold my building principal accountable for those employees. So it flows through them. They do the – go through the process of interviewing and selecting and making recommendations through me. Of course, we're communicating the whole time, but they're the ones doing it. So how much involved, not very involved as far as the particulars and the details until they get to the recommendation stage, and then they come in and make recommendations and that's what gets presented to the board.

[60], Ex. 4 at p. 2.

Turner's testimony was consistent with Dr. Luke's on this point. Notably, Turner testified that the hiring decision was "[his] job *and Coach Shorter's job*, our AD, to make that selection." *Id.*, Ex. 2 at p. 5. Turner also testified that he and Shorter discussed hiring Billups:

Q. After getting the packet, did you and Coach Shorter discuss Coach Billups applying for the position?

A. Like I said, we – he – I told him that he had came by. And told him that he was interested, and I asked Coach Shorter that – I told him I had gotten a phone call and that some Trojans 4 Life had came by.

And he told me the exact same thing. He had gotten the same phone calls. They visited him. You know, just – you know, they made the rounds, if I can just say that. Yeah. Yeah.

Q. Did Coach Shorter express to you any reservations about or concerns about hiring Coach Billups for the position?

A. During our conversation, we talked about the coaching style. That was the only reserves that we, you know, both had was [Billups'] coaching style.

*Id.* at p. 6-7.

Further, Shorter participated extensively in the interview process with the eventual hire

Coach McCurry. In his deposition, Shorter testified:

Q. Okay, So you interviewed Coach McMurry and one other coach already there?

. . .

A. [S]o me and Mr. Turner came in and we just told the guys [basketball team] that *we* were going to work quickly and find them a coach…

[Me] and Mr. Turner and then he [McCurry] showed interest that he wanted the job, so *we* interviewed him.

And when *we* interviewed him, he had a really, really great plan how he was going to do both [coach the boys and girls team].

*Id.*, Ex. 1 at p. 4 (emphasis added).

Despite LMSD now attempting to downplay his role, LMSD listed Shorter in its EEOC

Position Statement as one of two people "involved in the decision" to hire Coach McCurry. [64],

23

Ex. 3 at p. 2-3. The record undercuts LMSD's position that Shorter had no authority or leverage over the employment decision. In fact, the evidence reveals quite the opposite. Shorter was *heavily* involved in the process. Considering *Palasota* and undisputed facts from the record, the Court has no trouble concluding that Shorter meets the "position to influence the decision" standard. *Palasota*, 342 F.3d at 578. As such, Shorter's comments are proper circumstantial evidence that *both* of LMSD's stated reasons for not hiring Billups were pretextual.

In conclusion, the question "is not whether [Billups] proves pretext, but rather whether [he] raises a genuine issue of fact regarding pretext. *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991). He has done so. Overall, considering the comments made by Shorter in conjunction with the inconsistent application of the internal hiring policy, a reasonable jury could infer discrimination. The Court finds that Billups has created a question of fact as to pretext in whether his age was the reason he was not hired by LMSD. Accordingly, summary judgment as to Billups' ADEA claim is not appropriate.

*Conclusion*

For the reasons set forth above, LMSD's Motion for Summary Judgment [60] is DENIED. Billups will be permitted to proceed to trial on the claim.

SO ORDERED, this the 31st day of March, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE